# JOHN C. GREEN *v.* GARNETT BEATRICE GREEN

[No. 144, September Term, 1979.]

*Decided June 27, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Weldon Leroy Maddox* for appellant.

*Michael D. Steinhardt,* with whom was *Gerald P. Sellers, P.A.* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

Petitioner John C. Green was determined by Judge Joseph H. H. Kaplan to be in contempt of the Circuit Court of Baltimore City on January 12, 1979, for his failure to make accrued child support payments owed to respondent Garnett Beatrice Green pursuant to a divorce and child custody decree of November 8, 1971. Before this Court, the father maintains that, for a number of reasons, the contempt order is defective, and accordingly the judgment of the Court of Special Appeals affirming the decree of the trial court should be reversed. Since we concur with the petitioner that the present effort to enforce payment of the arrearages by way of contempt proceedings is barred by a failure to promptly pursue this remedy, we find it unnecessary to pass upon his other contentions, and will reverse the judgment of the intermediate appellate court.

The parties to this dispute, after being married on October 8, 1948, were divorced twenty-three years later on November 8, 1971, and it is the offspring of their union that are the subject of the present acrimony. The decree, which terminated the marital bond also established the respective rights and duties of the parties, providing, in part, that petitioner pay to respondent $1150 per year for her support, as well as for the maintenance of their two minor sons, Thomas and Herman. The respondent has made one previous attempt to have her former husband adjudged to be in contempt of court for his failure to make the payments required by the decree, but this effort was not pursued to a

conclusion, and has apparently been abandoned. Although Mrs. Green claims that her former husband has made no payments under the decree, she took no further legal action to collect the arrearage until over four years later. On March 9, 1977, the mother caused an order to be issued requiring petitioner to show cause why he should not be held in contempt of court for failure to obey the court order "passed on the 8th day of November, 1971, directing payment of Child Support." To this order, the petitioner defended, in part, by alleging "[t]hat it is now too late, over five years, to file a contempt petition against [him] for child support." [1] The matter was assigned for a hearing before a master, who concluded, among other findings not now pertinent:

    i) that the support obligation commenced on December 31, 1971;

    ii) that Thomas became emancipated on May 14, 1973, and Herman on August 31, 1975;

    iii) that the obligation of child support for each son was respectively terminated as of those dates; and

    iv) that payment of the arrearages could be enforced through contempt proceedings.

When Judge Kaplan overruled Mr. Green's exceptions to the master's report, and in effect adjudged him to be in contempt of court, the petitioner appealed to the Court of Special Appeals, which affirmed the trial court's order. *Green v. Green,* 44 Md. App. 136, 407 A.2d 1178 (1979). We granted certiorari.

The petitioner in this Court advances the contention, which we find dispositive in this case, that the judgment below must be reversed because the contempt proceedings initiated in the trial court on March 9, 1977, is barred by what Mr. Green denominates to be "laches." In support of this position, the father relies on our decision in *Winkel v.*

---

**1.** Since bar by limitations was raised by the petitioner in this case, we are not called upon to determine whether the failure to do so would constitute a waiver of such a defense.

*Winkel,* 178 Md. 489, 15 A.2d 914 (1940), where Judge Parke, speaking for the Court, said:

> [T]he enforcement of the collection of the moneys due might continue to be by way of *scire facias,* attachment, execution or by other equitable remedies if within the period of limitations, but it seems to the court that, after the expiration of one year from the time the payment of any installment of permanent alimony fell due and remained unpaid, there should be a bar to a proceeding for contempt against the contemnor in respect of any such default in payment. In the opinion written for the court by Judge Sloan in *Kalben v. King,* [166 Md. 632, 172 A. 80 (1934)], there is a somewhat similar suggestion, and its adoption, as here stated, is supported by practical considerations in the administration of justice and by the fact that alimony is founded in the necessity, and the design, for current maintenance and support of the wife and children. The practice in England affords a basis for adoption. As here stated and limited the rule is subject, however, to exceptions created by special circumstances, as absence of the husband from the jurisdiction or some other particular reasons shown. [*Winkel v. Winkel, supra,* at 506-07, 15 A.2d at 922.]

The petitioner, observing that it is undisputed that his obligation to support his sons terminated upon their emancipation, argues that the bar to suit after one year established in *Winkel* (here, counting from the latest emancipation date) prohibited the trial court from entertaining the present contempt proceedings. When presented with the same assertion, the Court of Special Appeals rejected this contention after concluding that our later decision of *McCabe v. McCabe,* 210 Md. 308, 123 A.2d 447 (1956), was "in total derogation" of the rule established in *Winkel. Green v. Green, supra,* 44 Md. App. at 149, 407 A.2d at 1185. We disagree.

In *McCabe,* this Court was presented, for the first time, with the issue "whether a court of equity in Maryland will enforce here by the sanctions customarily used by equity courts a decree for alimony entered by a court of another State." *Id.* at 310, 123 A.2d at 448. After reviewing some of the applicable authority from other jurisdictions, and noting that the public policy of Maryland permitted the relief requested, the Court determined that

> if the wife in this case were proceeding under a domestic equity decree, or if she were residing in another state and proceeding under the Uniform Reciprocal Enforcement of Support Act against her husband who was in this State, the husband could be made to obey orders to support by sanctions available to equity. We see no reason why the same sanctions may not be made available to compel him to obey the decree of another state . . . . [*Id.* at 315, 123 A.2d at 451.]

It is apparent from a reading of *McCabe* that there we were not faced with, and did not address, whether laches, limitations or the prohibition announced in *Winkel* applied to bar contempt proceedings in the case then before us, or more generally when foreign decrees are enforced in the equity courts of Maryland. Indeed, the breadth of our decision in *McCabe* was specifically delineated when, by way of conclusion, Judge Hammond said for this Court:

> We need not and do not decide now the answer to the various problems that may arise in the enforcement in equity of foreign decrees for alimony and support. We decide only that in Maryland an equity court can enforce a decree of another state, . . . and may use for its enforcement the same equitable remedies and sanctions it could use to enforce a decree it had duly entered in the first instance . . . . [210 Md. at 317-18, 123 A.2d at 452.]

Thus, it becomes manifest from this explicit limitation as to the scope of the *McCabe* decision that, by concluding it

implicitly overruled the *Winkel* proscription, the Court of Special Appeals has ascribed to *McCabe* a breadth neither expressed nor intended. With this determination — that the *McCabe* decision in no way undermined the vitality of the bar established in *Winkel* — we now turn to explain why, in our view, the rule there announced should have equal application to the enforcement of child support arrearages via contempt.

In reviewing our *Winkel* decision as well as other applicable authority, we observe that there are two reasons for the application, in this State, of the one year restriction rule to the enforcement of past-due child support by means of the contempt power. The first becomes clear from a close examination of the *Winkel* decision itself and the nature of alimony with which we were there concerned.[2] This Court has recently reiterated that the obligations to pay alimony and child support, while different, are not wholly distinct. *Stancill v. Stancill,* 286 Md. 530, 537-38, 408 A.2d 1030, 1035 (1979). "[I]t is our view that provisions granting the wife alimony or maintenance, in either a separation contract or divorce decree, are not created in a vacuum, independent

---

2. The one year restriction announced by this Court in *Winkel* was adopted from a similar rule applied by the English Ecclesiastical Courts with respect to alimony. Winkel v. Winkel, 178 Md. 489, 506-07, 15 A.2d 914, 922 (1940). An examination of the English precedents gives ample support for the conclusion that there was a one year period of limitations applied by the church courts. Wilson v. Wilson, 5 Eng. Ecc. 129 n. (1830); DeBlaquiere v. DeBlaquiere, 164 Eng. Rep. 634 (1830). *See also* Cambell v. Cambell, [1922] P. 187; Kerr v. Kerr [1897] 2 Q.B. 439; Watkins v. Watkins, [1896] P. 222. See in addition, 2 Bishop on Marriage, Divorce and Separation, § 1098 (1891). We would point out that section 3-603 (a) of the Courts Article of the Maryland Code (1974, 1980 Repl. Vol.), granting jurisdiction to courts of equity in matters of divorce, alimony and annulment of marriage, provides that the "court shall hear and determine a case of alimony in as full and ample manner as such case could be heard and determined by the Ecclesiastical Courts of England." Moreover, we add that this Court has long held that "the decisions of the English Ecclesiastical Courts, in similar cases, may properly be referred to as precedents; and they have uniformly been cited and relied on as safe and authoritative guides for the courts of this State . . . ." J.G. v. H.G., 33 Md. 401, 407, 3 Am. Rep. 183 (1870). See also Dougherty v. Dougherty, 187 Md. 21, 48 A.2d 451 (1946); Clarke v. Clarke, 149 Md. 590, 592, 131 A. 821, 822 (1926). Furthermore, since alimony awarded by the ecclesiastical court often envisioned some amount for the support of children, the same English precedents relied on by this Court in *Winkel* may be viewed as authority for the application of the one year restriction to child support.

of considerations that bear directly on the well-being of the child." *Id.* Often, in determining the amount of alimony that should be awarded, the custody, maintenance and care of children are factors that the chancellor takes into account, in part, in arriving at a specific award. See *Raible v. Raible,* 242 Md. 586, 598, 219 A.2d 777, 782-83 (1966); *Wygodsky v. Wygodsky,* 134 Md. 344, 347, 106 A. 698, 699 (1919). Thus, alimony can, and frequently does, encompass a certain amount intended to provide support for the children of the divorced couple. Indeed, the divorce decree of the parties to this litigation illustrates the overlap that sometimes exists when it provides that Mr. Green "pay to the complainant [(Mrs. Green)] the sum of $1150.00 per year for the support and maintenance of said children *and complainant . . . .*" (emphasis supplied). It seems to us that the specific limitation laid down in *Winkel,* to the extent of the part of an alimony award that is intended to provide, or is in fact used, for the care of the children, operates to prohibit contempt proceedings to collect child support not commenced within the period of the rule. The Court in *Winkel* recognized as much when it said the adoption of this bar "is supported by practical considerations in the administration of justice and by the fact that alimony is founded in the necessity, and the design, for *current maintenance and support of the wife and children*." *Winkel v. Winkel, supra,* 178 Md. at 506, 15 A.2d at 922. (emphasis added). We believe that, by applying the prohibition established in *Winkel* to the circumstances of this case, we do no more than recognize what has already been said. In our view, there is no reason why different rules should pertain to a separate award of child support and child support subsumed in an alimony payment.

The second basis for the application of the holding in *Winkel* to efforts to collect child support by contempt emanates from numerous prior decisions of this Court to the effect that "[i]f the remedy sought in equity is analogous to a remedy cognizable at law, and the statute of limitations prescribes a time within which the legal action must be instituted, equity will follow the law and bar the action."

*Maskel v. Hill,* 189 Md. 327, 337, 55 A.2d 842, 846 (1947). *Accord, e.g., Desser v. Woods,* 266 Md. 696, 704, 296 A.2d 586, 591 (1972); *Stevens v. Bennett,* 234 Md. 348, 351, 199 A.2d 221, 223-24 (1964); *Cargill v. Brady,* 231 Md. 455, 457, 190 A.2d 793, 794 (1963); *Knight v. Brawner,* 14 Md. 1, 7 (1859). It seems implicit in *Winkel* that this principle, though not expressly mentioned there, was relied on by the Court to analogize the proceeding for contempt for non-payment of alimony, with which this Court was then concerned, to criminal prosecution for nonsupport of a wife. At the time of that decision, the statute of limitations contained in Md. Code (1939), Art. 57, § 11 barred prosecution for criminal nonsupport of a wife, *Id.* Art. 27, § 89, unless the proceeding was commenced within one year of the offense. So it still does today. Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 88 (a) (criminal nonsupport); Md. Code (1974, 1980 Repl. Vol.), Courts Art., § 5-106 (a) (statute of limitations). The one year limitation presently contained in § 5-106 (a) of the Courts Article also applies to criminal prosecution for nonsupport of a child brought under Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 88 (b), and, in our view, should by analogy, in the absence of special circumstances justifying a contrary result, be applied to proceedings to enforce child support arrearages by utilization of the contempt power. In this regard, it is instructive to set out part of Art. 27, § 88 (b) (3) in order that the reader may appreciate its marked similarity to the enforcement of child support by exercise of the civil contempt powers possessed by the court:

> [T]he court, in its discretion, having regard to the circumstances and financial ability of the defendant, may pass an order that . . . directs the defendant to pay a certain sum weekly for the space of three years to the person or institution having custody of the minor child . . . . If there is an agreement with respect to such child or children, the court may pass an order directing that the defendant adhere to the provisions of the agreement . . . . If the court passes the order, the

court may release the defendant from custody on probation for the space of three years . . . . If the court be satisfied ... that the defendant has violated the terms of the order, the court immediately may proceed to the trial of the defendant under the original indictment or sentence him or her under the original conviction. . . .

In light of the pellucid parallelism between the crime and punishment contained in this section and that of a proceeding for civil contempt to coerce payment of accrued child support, it would be incongruous to conclude that prosecution under § 88 (b) is not analogous to contempt proceedings to collect child support that is due. Certainly, the substantive effect on the petitioner of the two proceedings is largely equivalent. We find support for this determination in the words of Mr. Justice Holmes who, on an appeal from a criminal contempt citation and imprisonment order for conduct barred from prosecution under federal law by the three year federal criminal statute of limitations, stated for the United States Supreme Court:

Even if the statute [of limitation] does not cover the case by its express words, as we think it does, still, in dealing with the punishment of crime a rule should be laid down, if not by Congress by this court. *The power to punish for contempt must have some limit in time,* and in defining that limit we should have regard to what has been the policy of the law from the foundation of the Government. By analogy, if not by enactment, the limit is three years. The case cannot be concluded otherwise so well as in the language of Chief Justice Marshall in a case where the statute was held applicable to an action of debt for a penalty . . . . "[I]t deserves some consideration, that if it does not limit actions of debt for penalties, those actions might, in many cases, be brought at any distance of time. This would be utterly repugnant to the genius of our laws."

[*Gompers v. United States,* 233 U.S. 604, 612-13, 58 L. Ed. 1115, 34 S. Ct. 693 (1914) (emphasis added) (quoting from *Adams v. Woods,* 6 U.S. (2 Cranch) 336, 340-42, 2 L. Ed. 297 (1804)).]

We agree that the imprisonment sanction, when used to coerce support payments, must have some limit in time. Since the founding of the republic, the "genius" of this jurisdiction's laws has prescribed a one year statute of limitations, presently codified in Md. Code (1974, 1980 Repl. Vol.), Courts Art., § 5-106 (a), for criminal conduct of the type apparently present in this case, see 1777 Md. Laws, ch. 6. The courts of this State should not lightly deviate from this longstanding expressed policy in proceedings substantially analogous to prosecution for crimes within the gambit of the statutory limitation.

It follows from what we have said that unless there exist "special circumstances" requiring a deviation from the general rule announced in *Winkel,* the proceeding in the circuit court was barred by the application of that case's prohibition. It is generally established that the absence of the spouse from the jurisdiction is one such "special circumstance" that can toll a limitation period or defeat a defense of laches, and indeed it was expressly recognized to apply to the bar created in *Winkel. Winkel v. Winkel, supra,* 178 Md. at 507, 15 A.2d at 922; *accord, Gregg v. Gregg,* 220 Md. 578, 583-84, 155 A.2d 500, 504 (1959); *Marshall v. Marshall,* 164 Md. 107, 114, 163 A. 874, 876 (1933). See also Md. Code (1974, 1980 Repl. Vol.), Courts Art., § 5-205 (b). There is no evidence in the record of this case, however, to indicate that the petitioner has been absent from the jurisdiction for a period of time sufficient to prevent a bar of these proceedings. Furthermore, the respondent need only have sought, in an appropriate manner, a citation for contempt accompanied by a request for service of process to toll the running of the limitation period. *Piersma v. Seitz,* 262 Md. 61, 62, 276 A.2d 666, 666 (1971). Thus, since factually the exception does not exist in this case, and since more than one year has elapsed from the date that each

installment for child support fell due and remained unpaid (the limitation period begins to run with respect to each installment as it became due, *Winkel v. Winkel, supra,* at 506-07, 15 A.2d at 922), we conclude that the trial court should not have entertained the respondent's petition to hold Mr. Green in contempt of court. We therefore reverse the decision of the intermediate appellate court affirming the contempt citation.

> *Judgment of Court of Special Appeals reversed, and case remanded to that court with instructions that it reverse the judgment of the Circuit Court of Baltimore City.*
>
> *Costs to be paid by the respondent.*