Yvette M. BONNEY

v.

Paul E. BONNEY.

Yvette JOHNSON a.k.a. Yvette Rochelle a.k.a. Yvette M. Bonney

v.

Paul E. BONNEY.

No. 95–737–Appeal.
No. 96–358–M.P.

Supreme Court of Rhode Island.

June 16, 1997.

Kathleen Managhan, Newport, for Plaintiff.

Susan Carlin, Stephen R. Famiglietti, Providence, for Defendant.

Before WEISBERGER, C.J., and BOURCIER, FLANDERS, JJ.

## OPINION

**PER CURIAM.**

This case came before a hearing panel of this court for oral argument May 21, 1997, on an appeal and also on a petition for writ of certiorari, both filed by Paul E. Bonney (Paul) in order to seek review of an adjudication of contempt for failure to comply with an order to pay child support. The adjudication of willful contempt was made by a judge of the Family Court in implementation of G.L. 1956 § 10–7–2, as amended by P.L.1994, ch. 180, § 1. This case was placed on the show-cause calendar for summary disposition. We conclude that summary disposition is appropriate and proceed to decide the issues at this time.

We deny and dismiss the appeal, deny the petition for certiorari, and affirm the adjudication of contempt. The facts of the case insofar as pertinent to this appeal are as follows. Yvette M. Bonney (Yvette) and Paul were husband and wife until they were divorced in 1987. During the marriage a minor child, Jaime Bonney (Jaime) was born on December 9, 1985. The final judgment of divorce was entered July 30, 1987, leaving open the question of child support. Thereafter, on September 13, 1989, Yvette filed a motion for child support and alimony. Subsequent to the filing of this motion, the court entered an order to which the parties consented, pursuant to which Paul was obligated to pay $40 per week as child support beginning December 15, 1989. In February and March of 1990 Paul's paycheck was garnisheed, and as a result of said garnishment Yvette received a total of $182.55 toward child support.

Shortly thereafter, defendant moved to Florida and from that time forward made no payments of child support. While residing in Florida, Paul held a number of construction and maintenance jobs and then moved to Michigan where he was employed as a maintenance engineer at a hotel and as a floor guard and skating-room worker at a skating facility. He occasionally called his son, and on two occasions Jaime visited him in Florida. However, during this period Paul paid no child support.

On October 10, 1994, Jaime was killed in a tragic accident when an automobile in which he was a passenger was struck by a police cruiser owned by the town of North Kingstown. Yvette filed a complaint pursuant to the wrongful-death statute against the town of North Kingstown and the officer who was operating the cruiser at the time of the accident. Paul also filed a wrongful-death action against the same party. Section 10–7–2 of the wrongful-death statute as amended on July 8, 1994, by P.L.1994, ch. 180, § 1, reads in part as follows:

"[N]o person who is adjudged to be in wilful contempt of being in excess of six (6) months in arrears of an order to pay child support for the deceased individual shall be allowed recovery pursuant to this chapter and such person shall be deemed to have predeceased the child for the purpose of determining distribution under the intestacy statute."

In order to implement the terms of the statute, Yvette moved in the Family Court to adjudge defendant in contempt for failure to have paid child support from March of 1990 until October 10, 1994. Before the motion came on for hearing in the Family Court, Paul deposited $13,000 into the registry of the court and filed a motion for determination by the court in regard to the exact amount of child support due to plaintiff. Paul's motion was filed July 19, 1995. Thereafter Yvette filed an amended motion to adjudge Paul in contempt notwithstanding his payment and also requested a declaration that Paul had been in willful contempt within the meaning of § 10–7–2 since he was in arrears in payment of child support in excess of six months at the time of the child's death and prior to the payments being made.

A hearing was held before a judge of the Family Court on August 30, 1995, and September 15, 1995. Thereafter, on October 12, 1995, the Family Court judge made findings that defendant was in willful contempt of the order for child support entered February 19, 1990, and that the arrearage was $11,787.15. He found that $8,665.13 was owed to the state (for welfare payments) and $3,132.02 was owed to Yvette. He further assessed a counsel fee against Paul in the sum of $1,500

together with costs of $261. He also adjudged that Paul was in willful contempt of the support order for a period of more than six months. He found that defendant had had the ability to have made the child-support payments and that this ability was corroborated by his payment of $13,000 into the registry of the court. In support of his findings of contempt the trial judge made the following comments:

"Paul Bonney is in contempt under every definition of the word. He has never contributed voluntarily for the support of his child. In the five years since the entry of the support order, he has made only four payments, totalling a mere $182.55, all of which were withheld from his income. Within four weeks of the entry of the order he moved to Florida primarily to defeat the garnishment order and avoid his child support obligations. His delinquency was at least a contributing factor to plaintiff's subsequent reliance on public assistance, thus requiring taxpayers to bear his parental responsibilities. To add insult to injury, he paid $13,000 into the court registry after his son's tragic death in order to preserve his interest as a potential beneficiary of his son's estate. Yet, during the last * * * years of his son's life, he chose to pay not one dime for the child's benefit."

He then commented that it was the legislative intent in amending § 10–7–2 to prevent a person such as Paul from paying off his arrearage for the purpose of recovering for the wrongful death of his child. He asserted that such an interpretation of the statute would render it a nullity.

Paul raises several issues in support of his appeal and petition for certiorari. He argues that the Family Court had no jurisdiction to enforce a child-support order after the death of the child. He further argues that the 1994 amendment to § 10–7–2 is not applicable to him because he had not been adjudged in contempt as of the date of Jaime's death. He further argues that a person's right to inherit is fixed as of the date of death and that an adjudication of contempt after the death cannot retroactively affect those fixed rights. He also argues that he could not be declared in contempt because, having paid the money into the registry of the court, he eliminated the controversy since the payment satisfied the arrearage of the child support order.

■ We shall first consider the question of Paul's appeal. General Laws 1956 § 14–1–52(b) provides that any party aggrieved by an order of the Family Court relating to a finding of contempt for failure to pay child support "may * * * seek review of questions of law in the supreme court by petition for writ of certiorari." This statute clearly delineates the sole method of securing appellate review and rendered the purported appeal improper. Consequently the appeal is hereby dismissed.

■ This court did issue a writ of certiorari pursuant to which the Family Court adjudication of contempt will be reviewed. We conclude that the factual findings of the Family Court were supported by overwhelming evidence. To suggest that the Family Court had no jurisdiction to adjudicate Paul in contempt for arrearage that existed at the time of his child's death is utterly without merit. In spite of the death of the child, the Family Court had continuing jurisdiction over the parties to the divorce. An adjudication of contempt not only serves to make whole the party to whom support should have been paid but is also utilized to vindicate the authority of its decrees. *Lippman v. Kay*, 415 A.2d 738, 742 (R.I.1980).

In *Centazzo v. Centazzo*, 556 A.2d 560, 562 (R.I.1989), we held under somewhat analogous circumstances that the death of a spouse to whom alimony was payable did not relieve the obligor of the liability to pay alimony that accrued before the death of the spouse. Similarly in the case at bar the obligation of the father to pay past-due child support did not abate at the time of the death of the child. As in *Centazzo* the Family Court had full authority to enforce this obligation by appropriate process.

In a number of jurisdictions contempt proceedings have been permitted in order to enforce the payment of child-support arrearages after the child has been emancipated or reached majority. *See, e.g., Tande v. Bongiovanni*, 142 Ariz. 120, 688 P.2d 1012, 1013

(1984); *Arnold v. Arnold,* 35 Conn.Supp. 244, 407 A.2d 190, 191 (1979); *Green v. Green,* 44 Md.App. 136, 407 A.2d 1178, 1182–84 (1979), *rev'd on other grounds,* 288 Md. 127, 415 A.2d 1131 (1980). These courts have enunciated the rule that sound public policy supports the principle that a delinquent parent can and should be coerced into meeting his or her obligation after the child has come of age. This policy avoids rewarding one who by absconding from the jurisdiction or other crafty device has managed to avoid enforcement of his or her obligation.

 We conclude that these cases are analogous to the case at bar. We shall not allow Paul to ignore his obligation for almost four and one-half years and then claim that the court is powerless to declare his behavior contumacious. At the time of the child's death Paul was in willful contempt of the court order to which he had consented. He had not been adjudged in contempt because he was out of the court's jurisdiction until he returned to Rhode Island and was seized under a body attachment and presented to the court. The adjudication of contempt only constitutes the official imprimatur of the court in labeling the conduct. The contemptuous conduct had existed from March 1990 until October 10, 1994. Paul could not avoid the consequences of his willfully contemptuous conduct by the transparent device of depositing a sum of money into the registry prior to the hearing on Yvette's motion to adjudge him in contempt. In accepting jurisdiction and declaring the defendant in willful contempt for more than six months, the trial justice was correct in fact and in law.

For the reasons stated, the petition for certiorari is denied and the writ heretofore issued is quashed. The appeal is denied and dismissed and the adjudication of contempt by the Family Court is affirmed. The papers in the case are remanded to the Family Court with our decision endorsed thereon.

LEDERBERG and GOLDBERG, JJ., did not participate.